IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-348

No. COA20-238

Filed 20 July 2021

Mecklenburg County, No. 16 CRS 230044

STATE OF NORTH CAROLINA

v.

PATRICK JAMAAL CHAMBERS

Appeal by Defendant from Judgment entered 29 April 2019 by Judge Donnie Hoover in Mecklenburg County Superior Court. Heard in the Court of Appeals 25 May 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Brian D. Rabinovitz, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

¶ 1 Patrick Jamaal Chambers (Defendant) appeals from a Judgment entered upon a jury verdict finding him guilty of First-Degree Murder. The Record tends to reflect the following:

¶ 2        David[1], the victim in this case, was two years old when he died.  Jonathan David Privette (Dr. Privette), a forensic pathologist and medical examiner, performed an autopsy on David's body the day after David died.  Dr. Privette noted David suffered multiple injuries.  External injuries included: a contusion on his left forehead; numerous contusions on his chest (possibly from CPR), abdomen, pelvic area, lower back, and legs; and a burn scar on the right thigh.  Internal injuries included: subgaleal hemorrhaging near the forehead and top of the head; a fracture of the sagittal suture of the skull; subdural and subarachnoid hemorrhages in the brain; internal bleeding in the abdomen; fractured ribs; lacerations of the liver and pancreas; and damage to the small bowel.  According to Dr. Privette, David's abdominal injuries would have caused David to be in "real trouble" within "minutes to an hour" after David sustained those injuries.  In Dr. Privette's opinion, David died as a result of the blunt force abdominal injuries, but that all the injuries contributed to David's death.

¶ 3        On the date of David's death, he was residing with his mother R.W., four siblings (two sisters and two step-sisters), and Defendant.  R.W. met Defendant in 2009 when R.W. lived in the same apartment complex as Defendant.  R.W. and Defendant lost contact at some point, but the two reconnected and started a sexual

---

[1] A pseudonym used to assist in preserving the identity of the minor victim and for ease of reading.

relationship in 2015. Defendant moved in with R.W. and the children in April of 2016 after David's father, S.W., moved out. While Defendant lived at the house during the weekdays, Defendant regularly: played with R.W.'s daughters; helped all of the children get ready for bed, including helping David brush his teeth; helped potty train David; and checked in on the children at night. Defendant would also help with yardwork, cleaning, and cooking meals.

¶ 4    On one June evening in 2016, Defendant was outside grilling for the household while David was outside playing. R.W. was inside washing dishes. R.W. heard David scream. When R.W. got to David he was whimpering and would not tell R.W. what had happened. When R.W. asked Defendant what was wrong, he said "[n]othing" and that David was always "whining[.]" The next morning, when R.W. was helping David use the bathroom, she noticed a burn mark on David's leg. R.W. confronted Defendant about what happened the night before, and Defendant said that a coal had "popped out" of the grill and landed on David when Defendant added coals to the grill.

¶ 5    On 22 July 2016, the Friday before David died, R.W. noticed that David was walking abnormally and that he had a red eye. R.W. called David's father, S.W., and asked him to take David to the emergency room. S.W. picked David up after S.W. got off work at 11 p.m., and he took David to the emergency room. After three or four hours of waiting in the emergency room, David had still not been seen by a doctor. S.W. decided to take David back to S.W.'s home; he told R.W. David had been seen by

a doctor and that there was nothing wrong with the child. S.W. took David back to R.W.'s house that Sunday, 24 July 2016.

¶ 6        On 25 July 2016, the next day, the children went to daycare and school. That evening, Defendant cooked dinner for R.W. and the children. After the children went to bed, R.W. engaged in a number of text and phone conversations with S.W. At some point, Defendant interrupted and asked R.W. if David ever slept with his eyes open; R.W. responded that David did at times. Shortly thereafter, Defendant asked R.W. if David ever had seizures or foamed at the mouth; R.W. said no. Then, R.W. heard David scream and saw Defendant rush through the dining room with David in his arms. Someone called 911 and Defendant performed CPR on David. The Charlotte Fire Department responded to the call. David was eventually transported to the hospital as he was not breathing. R.W. followed the ambulance transporting David to the hospital, and Defendant remained at the home with the other children. Hospital staff were unable to resuscitate David, and he died.

¶ 7        A Mecklenburg County Grand Jury indicted Defendant on a charge of First-Degree Murder, under N.C. Gen. Stat. § 14-17, on 15 August 2016. Defendant's case came on for trial on 22 April 2019. After the State rested its case, Defendant moved to dismiss for insufficiency of the evidence. The trial court denied the Motion. Defendant did not present any evidence and renewed his Motion to Dismiss for insufficient evidence; the trial court denied the renewed Motion.

¶ 8        In its closing remarks, the State told the jury: "The crime, of course, is first-

degree murder in the perpetration of a felony."  The trial court instructed the jury:

> The defendant has been charged with first-degree murder in the perpetration of a felony, which is the killing of a human being by a person committing felonious child abuse with a deadly weapon.
>
> For you to find the defendant guilty of first-degree murder in the perpetration of a felony, the State must prove five things beyond a reasonable doubt:
>
> First, that the defendant was a person providing care to or supervision of the child.
>
> Second, that at the time, the child had not yet reached his sixteenth birthday.
>
> Third, that the defendant intentionally assaulted the child, which proximately resulted in serious physical injury to the child.  A serious physical injury is such physical injury has causes great pain and suffering.
>
> Fourth, that the assault upon the child was committed with the use of a deadly weapon.  A deadly weapon is a weapon which is likely to cause death or serious bodily injury.  Hands or feet may be considered deadly weapons depending on the manner in which they are used and the size and strength of the defendant compared with the child.
>
> And fifth, that the defendant's assault was a proximate cause of the child's death.  A proximate cause is a real cause, a cause without which the child's death would not have occurred.

¶ 9        The jury found Defendant guilty of First-Degree Murder.  The trial court

entered Judgment consistent with the jury verdict and sentenced Defendant to life in

prison without the possibility of parole.  Defendant gave oral Notice of Appeal in open court.

## Issue

¶ 10        The sole issue raised by Defendant on appeal is whether there was sufficient evidence Defendant was a person providing care to or supervision of David as required by N.C. Gen. Stat. § 14-318.4(a) such that Defendant could have been guilty of the underlying felony of child abuse required in this case to convict Defendant of First-Degree Murder committed in the perpetration of a felony.

## Analysis

¶ 11        Defendant argues the evidence at trial was insufficient to permit a reasonable juror to find beyond a reasonable doubt that he committed First-Degree Murder based on the underlying felony of child abuse.  As a result, Defendant contends the trial court erred in denying his Motions to Dismiss.  "When ruling on a defendant's motion to dismiss for sufficiency of the evidence, the trial court must determine whether there is substantial evidence (1) of each element of the offense charged, . . . and (2) of defendant's being the perpetrator of such offense." *State v. China*, 370 N.C. 627, 632, 811 S.E.2d 145, 148 (2018) (citation and quotation marks omitted).  On appeal "[w]hether the State has presented substantial evidence is a question of law," subject to de novo review. *Id.*, 811 S.E.2d at 149 (citation omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citation omitted). "[T]he evidence should be considered in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn therefrom." *State v. Carrilo*, 149 N.C. App. 543, 548, 562 S.E.2d 47, 50 (2002) (citation omitted).

¶ 12 Relevant to this case, under N.C. Gen. Stat. § 14-17(a) a murder "committed in the perpetration . . . of any . . . felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree." N.C. Gen. Stat. § 14-17(a) (2019). Here, the State proceeded on a theory that the underlying felony supporting the charge of First-Degree Murder was Felony Child Abuse. Felony Child Abuse is defined as when a parent or: "any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child . . . ." N.C. Gen. Stat. § 14-318.4(a) (2019).

¶ 13 Thus, in sum, and as the trial court instructed the jury in this case, the State was required to prove beyond a reasonable doubt: (1) Defendant was a person providing care to or supervision of the child; (2) David had not yet reached his sixteenth birthday; (3) Defendant intentionally assaulted David, which proximately resulted in serious physical injury to David; (4) the assault upon the child was

committed with the use of a deadly weapon, in this case Defendant's hands or feet; and (5) Defendant's assault was a proximate cause of David's death.

¶ 14      Here, the only argument Defendant advances is that the trial court erred in denying his Motions to Dismiss on the basis there was insufficient evidence on which a jury could find Defendant was providing care to or supervision of David as required under the Felony Child Abuse statute. The statute does not define what comprises "care and supervision." However, we have found guidance in our State's juvenile code under N.C. Gen. Stat. § 7B-101(3) defining a "caretaker." *Carrilo*, 149 N.C. App. at 549, 562 S.E.2d at 51 (holding the defendant was a caretaker under the statute such that the defendant could be found guilty of child abuse as the underlying felony in a first-degree murder case). N.C. Gen. Stat. § 7B-101(3) defines "Caretaker" as:

> Any person other than a parent, guardian, or custodian who has responsibility for the health and welfare of a juvenile in a *residential* setting. A person responsible for a juvenile's health and welfare means a stepparent, foster parent, an adult member of the juvenile's *household*, an adult relative entrusted with the juvenile's care . . . .

N.C. Gen. Stat. § 7B-101(3) (2019) (emphasis added).

¶ 15      The North Carolina Supreme Court has further clarified N.C. Gen. Stat. § 7B-101(3) "protects children from abuse and neglect inflicted by people with significant, parental-type responsibility for the daily care of a child *in the child's residential setting*." *In re R.R.N.*, 368 N.C. 167, 170 ,775 S.E.2d 656, 659 (2015) (emphasis

added). In determining whether an adult had a significant enough degree of parental-type responsibility for a child, the trial court "must consider the totality of the circumstances . . . including the duration and frequency of care provided by the adult, the location in which that care is provided, and the decision-making authority granted to the adult." *Id.*

¶ 16       Our holding in *State v. Carrilo* is particularly instructive here. In *Carrilo*, the defendant was found guilty of first-degree murder of an infant. 149 N.C. App. at 544, 562 S.E.2d at 48. Defendant, who was not the infant's father, lived with the child and his mother from February to April 2000, when the infant died. *Id.* The day before the infant's death, the defendant shook the child because the child had been crying. *Id.* at 545, 562 S.E.2d at 48. After the incident: "the baby cried, got quiet, then fell asleep for a while," before waking up early the next morning coughing. *Id.* at 545, 562 S.E.2d at 49. Later that morning the infant was discovered not breathing, and after failed resuscitation attempts, was pronounced dead. *Id.* at 546, 562 S.E.2d at 49. On appeal this Court concluded that the defendant fell within the definition of a "caretaker" where:

> The evidence . . . establish[ed] that [the child] was dependent upon defendant for his care or supervision. The State's evidence showed that defendant had resided with [the child's] mother for two months prior to the murder, that [the child] and [the child's mother] shared the same bedroom with defendant, and that [the child's mother] had left [the child] in defendant's care for short periods of time.

*Id.* at 549, 562 S.E.2d at 51. Furthermore, "[o]n the day defendant allegedly inflicted the fatal injury upon the child, [the child] was left in defendant's care while his mother went to the kitchen to prepare a bottle." *Id.* Additionally, "on another occasion, [the child's mother] left the [the child] in defendant's care while she went to the store." *Id.* As a result, we held the evidence was sufficient for a jury to infer that the defendant " 'provided care to or supervision' of [the child] within the meaning of the felony child abuse statute." *Id.* (alterations in original).

¶ 17      Here, the evidence tended to show Defendant: slept at R.W.'s house every night from April to July 2016, except on weekends when he would visit his children; played with R.W.'s daughters regularly; helped potty train David; helped all the children get ready for bed; checked on the children at night; cooked meals for the household; did yardwork around the house; supervised David while the child played outside and Defendant cooked on the grill; and stayed with R.W.'s daughters when R.W. followed David to the hospital on the evening David died. Thus, based on the totality of the circumstances, the evidence in this case mirrors the evidence we found sufficient in *Carrilo*. Therefore, as in *Carrilo*, there was sufficient evidence upon which a jury could find Defendant provided "care and supervision" of David pursuant to N.C. Gen. Stat. § 14-318.4.

¶ 18 Nevertheless, Defendant argues the Court's holding in *In re R.R.N.* compels us to hold otherwise because the Court limited the definition of caretaker to those "with significant, parental-type responsibility for the daily care of a child in the child's residential setting." *In re R.R.N.*, 368 N.C. at 170, 775 S.E.2d at 659. However, the facts of that case are inapposite here. There, the defendant was convicted of child abuse for having sexual encounters with a twelve-year-old child during an overnight stay where the child stayed at the defendant's house. *Id.* at 168-69, 775 S.E.2d at 658. The defendant was a family friend and had several sexual encounters with the child over the course of a summer. *Id.* However, the defendant was convicted for the sexual encounter that occurred during the overnight stay. *Id.* at 169, 775 S.E.2d at 658. On appeal, the Court held the statute did not apply because the encounter in question was limited to one sleepover and occurred outside the child's residential setting. *Id.* at 170-71, 775 S.E.2d at 659. The Court reasoned although "[the defendant] may have been responsible for [the child's] short-term safety while she visited his home for one night, [the child's] mother retained the ultimate decision-making authority over her health and welfare." *Id.* at 170, 775 S.E.2d at 659. This holding does not compel the same conclusion here.

¶ 19 In this case, Defendant lived *in David's home*, at least during the weekdays, and did so for months. Defendant's encounters with David were daily and, although Defendant may not have had plenary parental authority, the evidence was sufficient

for a jury to find David depended on Defendant for "parental-type" care. Thus, there was sufficient evidence to support the charge of First-Degree Murder to be submitted to the jury on a theory it was committed in the perpetration of a felony: Felony Child Abuse. Therefore, the trial court did not err in denying Defendant's Motions to Dismiss. Consequently, the trial court did not err in entering Judgment upon the jury verdict.

## **Conclusion**

Accordingly, for the foregoing reasons, there was no error at trial, and we affirm the Judgment.

NO ERROR.

Chief Judge STROUD and Judge GRIFFIN concur.